CHARLES E. CANTER (Cal. Bar No. 263197)
Email: canterc@sec.gov
KELLY C. BOWERS (Cal. Bar No. 164007)
Email: bowersk@sec.gov
L. JAMES LYMAN (*Pro Hac Vice* Pending)
Email: lymanl@sec.gov

Attorneys for Plaintiff
Securities and Exchange Commission
Michele Wein Layne, Regional Director
Katharine E. Zoladz, Associate Regional Director
Amy J. Longo, Regional Trial Counsel
444 S. Flower Street, Suite 900
Los Angeles, California 90071
Telephone: (323) 965-3998
Facsimile: (213) 443-1904

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | Case No. 8:21-cv-01788 |
| Plaintiff, | **COMPLAINT** |
| v. | |
| BNZ ONE CAPITAL, LLC; BRETT REED BARBER; and LOUIS ALFONSO ZIMMERLE, | |
| Defendants, | |
| and | |
| GUARANTEED INCOME SOLUTIONS, INC., | |
| Relief Defendant. | |

Plaintiff Securities and Exchange Commission ("SEC") alleges:

## JURISDICTION AND VENUE

1.     The Court has jurisdiction over this action pursuant to Sections 20(b), 20(d)(1) and 22(a) of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. §§ 77t(b), 77t(d)(1) & 77v(a), and Sections 21(d)(1), 21(d)(3)(A), 21(e) and 27(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78u(d)(1), 78u(d)(3)(A), 78u(e) & 78aa(a).

2.     Defendants have, directly or indirectly, made use of the means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange in connection with the transactions, acts, practices and courses of business alleged in this complaint.

3.     Venue is proper in this district pursuant to Section 22(a) of the Securities Act, 15 U.S.C. § 77v(a), and Section 27(a) of the Exchange Act, 15 U.S.C. § 78aa(a), because certain of the transactions, acts, practices and courses of conduct constituting violations of the federal securities laws occurred within this district.  In addition, venue is proper in this district because Defendant Brett Reed Barber ("Barber") resides in this district and Defendant BNZ One Capital, LLC ("BNZ") has its principal place of business in this district.

## SUMMARY

4.     This action involves a securities offering fraud by an issuer and its co-owners and co-managing members, who raised at least $13.5 million from about 105 investors since June 2019.

5.     Defendants Barber and Louis Zimmerle ("Zimmerle") told investors that Defendant BNZ (collectively with Barber, Zimmerle and BNZ, "Defendants") was in the business of making investments in real estate and alternative investments.  Barber and Zimmerle promised investors that BNZ would repay investors their principal with a return of generally 10% per year, representing that BNZ's investments would

1

generate these returns.  Barber additionally told some BNZ investors that their investments were safe and the returns guaranteed.

6.     Since BNZ's inception, however, BNZ has not been profitable because its investments—when Barber and Zimmerle actually made investments—have not generated enough profit to return investor principal and pay the promised returns.  In fact, from June 2019 through February 2020, Defendants raised $6.9 million from investors, but invested only $2.7 million and generated less than $5,000 in profits from those investments.

7.     Instead of investing funds to generate returns, Defendants used investor funds to pay investors returns in a Ponzi-like scheme.  Barber and Zimmerle also paid themselves handsomely from investor funds, including transferring hundreds of thousands of dollars to Barber's company, Relief Defendant Guaranteed Income Solutions, Inc. ("GIS").

8.     Since at least March 2020, Defendants knew or were reckless in not knowing that BNZ's investments and the profits from those investments were insufficient to pay investors their returns.  Nevertheless, after March 2020, they raised an additional $6.6 million, misleading investors about BNZ's profitability, and continuing to make Ponzi-like payments to investors and lavish payments to themselves.

9.     All told, BNZ invested only $6.4 million of the $13.5 million in investor funds in real estate and alternative investments, generated barely $300,000 in profits, and made at least $1.7 million in Ponzi-like payments to investors.  And despite BNZ's miniscule profits, BNZ transferred more than $1.6 million to GIS and more than $700,000 to Zimmerle, while also paying certain of Barber's and Zimmerle's personal expenses, including for vehicles, meals, and travel.

10.    Through their conduct, and as further detailed below, Defendants violated the antifraud provisions of Section 17(a) of the Securities Act and Section 10(b) of the Exchange Act and Rule 10b-5 thereunder, as well as the registration

provisions of Sections 5(a) and 5(c) of the Securities Act. Barber and Zimmerle also violated the broker-dealer registration provisions of Section 15(a) of the Exchange Act.

11.     In addition to their primary liability for their violations of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder, Barber and Zimmerle are secondarily liable for BNZ's fraud as control persons pursuant to Section 20(a) of the Exchange Act.

12.     Relief Defendant GIS was unjustly enriched by the receipt of BNZ investor funds to which it had no legitimate claim.

13.     The SEC seeks findings that Defendants committed these violations; permanent injunctions against each Defendant's future violations of the securities laws; permanent injunctions precluding Barber and Zimmerle from participating in an unregistered securities offering; disgorgement with prejudgment interest from Defendants and the Relief Defendant, and civil monetary penalties against Defendants.

## **DEFENDANTS**

14.     **BNZ** is a California company formed by Barber, Zimmerle, and a third partner in May 2019 with its principal place of business in Newport Beach, California. Barber and Zimmerle have been BNZ's sole owners since December 2019. BNZ is not registered with the SEC in any capacity, and it has not registered any offerings of its securities.

15.     **Barber**, age 42, is a resident of Costa Mesa, California. Since May 2019, Barber has been a co-founder, co-owner, and co-managing member of BNZ. Prior to forming BNZ, Barber was affiliated with various insurance and brokerage firms selling insurance, annuity, and securities products. Barber previously held Series 6 and 63 securities licenses, but on March 16, 2012, Barber was barred by the Financial Industry Regulatory Authority ("FINRA") from associating with any member firm.

16.    **Zimmerle**, age 62, is a resident of Sacramento, California.  Since May 2019, Zimmerle has been a co-founder, co-owner, and co-managing member of BNZ. Prior to forming BNZ, Zimmerle was a real estate agent and developer.  Zimmerle has never been registered with SEC in any capacity.

## RELIEF DEFENDANT

17.    **GIS** is a Wyoming corporation formed by Barber in or about May 2018 with its principal place of business in Newport Beach, California.  It has never been registered with the SEC in any capacity.

## THE ALLEGATIONS

**A.    BNZ's Securities Offering**

18.    Barber and Zimmerle co-owned BNZ and controlled its operations.

19.    Both Barber and Zimmerle directly solicited investments for BNZ.

20.    Barber was more involved in raising money from investors, and Zimmerle was more involved in finding and negotiating investments for BNZ; however, both were actively involved in both sides of BNZ's operations.

21.    Barber and Zimmerle were the sole signatories on BNZ's bank accounts.

22.    Since June 2019, BNZ, Barber, and Zimmerle have offered and sold BNZ investments through promissory note agreement entitled "Lender/Investor's Statement Agreements" ("LIAs").

23.    Barber and/or Zimmerle signed the LIAs on behalf of BNZ.

24.    During that time, Defendants sold the LIAs to approximately 105 investors located in multiple states and raised approximately $13.5 million.

25.    Almost half of the amount raised came from funds held in investors' self-directed Individual Retirement Accounts ("IRAs").

26.    The LIAs stated that BNZ was "in the business of acquiring, maintaining, operating and holding funds for real estate investments and alternative investments."

27.    Under the LIAs, BNZ agreed to pay investors a return, which was generally 10% per year, and to return their principal.  The LIAs provided that BNZ would hold and use the investors' funds for a fixed period, which was generally one year.

28.    After the fixed period elapsed, at Defendants' urging, many investors rolled over their investments for additional fixed periods.

29.    In addition to principal and interest, BNZ and Barber promised some investors a so-called "bonus" to compensate them for surrender charges they would incur from moving funds from an existing investment to BNZ.

30.    For example, in or around March 2020, one investor invested $65,000 in BNZ but was promised a $20,000 bonus to make up for $19,000 in surrender charges she incurred in moving her funds from a prior investment to BNZ.

31.    BNZ and Barber also offered investors bonuses to keep their investments with BNZ after the fixed-time periods set forth in the LIAs.

32.    The LIAs were securities in the form of notes.

33.    The LIAs were also securities in the form of investment contracts.

34.    Investors provided BNZ funds in order to invest with BNZ through the LIAs and earn the promised returns.

35.    Investors' funds were pooled together in BNZ's bank accounts.

36.    The BNZ investments were passive, in that the LIAs promised returns based upon the efforts of Defendants.

37.    Defendants stopped raising new money through BNZ's offering in or around March 2021, when Barber and Zimmerle learned of the SEC's investigation.

38.    Barber, however, continued to solicit existing investors to roll over their maturing BNZ investments into new BNZ investments, through at least August 2021.

39.    Barber and Zimmerle directly participated in the offer and sale of the LIAs.  They each solicited individual potential investors, made presentations to

groups of potential investors at investor conferences, maintained a website that offered the LIAs, and signed LIAs on behalf of BNZ.

40.   BNZ paid compensation to Barber, Zimmerle, and independent sales affiliates on a transaction-based basis.

41.   For bringing in investors, BNZ made payments, which it called "finder's fees," to Barber, Zimmerle, and the sales affiliates.  BNZ based those payments on the amount raised from investors.

42.   Compensation to Barber for bringing in investors totaled approximately $1.4 million.

43.   Compensation to Zimmerle for bringing in investors totaled approximately $300,000.

44.   Similarly, BNZ paid the sales affiliates approximately $400,000 based on a percentage of the amount they raised from investors.

45.   BNZ did not take reasonable steps to verify whether the investors were accredited investors.

46.   For example, in or about September 2020, one investor told the BNZ sales affiliate that her net worth was less than $250,000, but she was told to sign the LIA anyway.

47.   At least one investor in BNZ's offering was unaccredited.

**B.    Defendants' Representations to Investors**

48.   The LIAs stated that BNZ had sole and absolute discretion to use such funds to pursue real estate and alternative investments and to enter into joint ventures.

49.   With respect to how BNZ would pay investors the promised returns, the LIAs indicated that BNZ would generate profits by investing in real estate.

50.    Specifically, the LIAs stated that the "goal [was] to obtain real estate at well below market value, sell the real estate for a profit, improve existing residential and/or commercial property and sell for a higher amount, and develop real estate for residential, commercial, retail, or special uses."

51.     In soliciting investments, Barber and Zimmerle told investors that BNZ was profitably investing real estate.  Barber and Zimmerle also showed investors documents purporting to show BNZ's profitability.

52.     Barber also told investors that their investments with BNZ were safe and the returns were guaranteed.

53.     For example, on or about October 2020, Barber told an investor that the investment was safe, the returns were guaranteed, and some of BNZ's investments were federally insured.

54.     Investors understood that BNZ would pay the promised returns from BNZ's purported profits.

55.     Indeed, Barber represented to some investors that BNZ would pay returns from its profits.

56.     For example, in or about February 2020, Barber met with an investor and represented that BNZ used investor money to invest in land and commercial buildings, that the land and commercial buildings were going up in value, and that BNZ used the money from such real estate investments to pay interest to investors.

57.     Zimmerle also made misleading statements to investors about BNZ's profitability.

58.     For example, in or about February 2020, Zimmerle (with Barber) represented to investors that BNZ would buy properties, flip them, and sell them at a profit.

59.     The LIAs represented that BNZ "shall maintain accurate and professionally managed records of all funds and accounts for their loan receipts, interest payments, purchases, sales, marketing expenses and other income and expenses."

60.     Barber told investors that he had a background and degree in finance, was experienced in investing people's money, or worked for a company that manages investors' money.

61.     Barber, however, did not disclose to investors that he had been barred by the Financial Industry Regulatory Authority ("FINRA") from associating with any member firm.

62.     Barber and Zimmerle were the makers of their own and BNZ's statements to prospective and actual investors, given their role as the company's founders, co-managers and sole principals.

63.     BNZ was also the maker of its own statements to prospective and actual investors.

**C.     Defendants' Fraud**

64.     Since its inception, BNZ failed to generate sufficient profits from investments to pay investors their returns and principal.

65.     Although BNZ did invest some investor funds in real estate and alternative investments, the investments generated insufficient profits for BNZ to pay commissions, fund Barber and Zimmerle's capital draws, and pay expenses without using investor funds.

66.     Since at least March 2020, BNZ, Barber, and Zimmerle knew, or were reckless in not knowing, that BNZ's investments were not generating sufficient profits to pay investors their returns and principal, but they nevertheless continued to offer and sell LIAs with the promise of fixed returns and repayment of investor principal.

**1.     June 2019 through February 2020: BNZ's Initial Offering**

67.     From June 2019 through February 2020, BNZ, Barber, and Zimmerle raised $6.9 million from investors.  During this period, BNZ maintained large cash balances of investor funds—approximately $2.4 million representing 30% of all investor funds at the end of February 2020—that generated no profits.

68.     Of the $6.9 million of investor funds raised through February 2020, BNZ invested only $2.7 million in real property and alternative investments.

69.    Through February 2020, BNZ had generated less than $5,000 in profits from these investments

70.    Despite generating almost no profits from BNZ's investments, Barber and Zimmerle made payments to themselves, affiliates, and to pay investors their returns.

71.    From June 2019 through February 2020, BNZ transferred at least $738,000 to Barber's company, GIS, and at least $233,000 to Zimmerle.

72.    BNZ also paid various personal expenses of Barber and Zimmerle, including approximately $4,973 in automobile expenses, $6,243 in meals and entertainment, and $4,738 in travel.

73.    From June 2019 through February 2020, BNZ paid at least $172,000 in compensation to sales affiliates.

### 2.    March 2020: Consultation with a Bookkeeper

74.    Between January and March 2020, BNZ retained an independent bookkeeper who agreed to review BNZ's financial information and to finally create a set of accounting records that would establish a chart of accounts, reconcile the accounting records to BNZ's bank records, produce the required 1099 tax statements, and establish the reports needed to eventually prepare tax returns.

75.    On March 20, 2020, Zimmerle emailed the bookkeeper an electronic version of a spreadsheet entitled "BNZ Placement and Payments" that contained information about investors' investments with BNZ.  Although the columns were not labeled, the spreadsheet shows for each investment:  (1) the principal person responsible for offering and selling the investment (i.e., Barber, Zimmerle, or the sales affiliate); (2) the investor's name; (3) the amount invested; (4) the month and year of the investment and repayment; and (5) the monthly return owed to the investor.  The spreadsheet showed investor funds to date totaling almost $8.9 million.

76.    In the email transmitting the spreadsheet, Zimmerle said that he was providing the spreadsheet in order to get the bookkeeper's "help in getting [BNZ's]

numbers in order."  Zimmerle told the bookkeeper that he was surprised by the magnitude of the amount raised from investors and that he was trying to understand the impact of the amount raised and the steps that needed to be taken "to ensure that [BNZ was] on solid footing."  He added, "[i]n other words, I want to be sure we aren't driving off a cliff or running into a wall."  He ended his email by stating that, while he believed that BNZ's real estate investments would generate revenue, "[t]he question will be do the revenues generated sustain the company and create a profit…." (Ellipsis in original)

### 3.    March 2020 through August 2021: the Ponzi-like Scheme

77.    By no later than March 2020, BNZ, Barber, and Zimmerle knew, or were reckless in not knowing, that BNZ was not generating sufficient revenues to pay returns to their investors.

78.    Despite their awareness of BNZ's lack of profitability, Defendants continued to raise money from investors and use investor funds to pay themselves, their affiliates, and returns to investors.

79.    From March 2020 through March 2021, Defendants raised an additional $6.6 million in new money from investors.

80.    From March 2020 through May 2021, BNZ invested only $3.7 million in real property and alternative investments (bringing its total investments in real estate and alternative investments to $6.4 million) and continued to maintain large cash balances of investor funds generating no profits.

81.    BNZ's investments continued to remain unprofitable relative to BNZ's liabilities to investors, generating only about $295,000 in profits after March 2020.

82.    From June 2019 through August 2021, BNZ's total profits on its investments amounted to just over $300,000.

83.    Despite the insufficient profits from BNZ's investments, Barber and Zimmerle used BNZ funds to pay themselves handsomely: from March 2020 through August 2021, BNZ transferred more than $941,000 to Barber's company, GIS, and

1   more than $517,000 to Zimmerle.  BNZ also paid $16,491 in automobile expenses,
2   $132,500 in legal fees, and $5,548 in meals and entertainment.

3       84.   In addition, Barber caused BNZ to issue him a loan of $1.2 million for
4   purchase of his home, charged himself only a 4% interest rate despite promising
5   investors 10% annual returns.

6       85.   From March 2020 through August 2021, BNZ paid at least $240,000 in
7   additional finders fees to sales affiliates for new investments

8       86.   Finally, from March 2020 through August 2021, BNZ paid investors at
9   least $1.3 million in Ponzi-like returns from investor funds.

10      87.   It would have been important to a reasonable investor to know that BNZ
11  was not profitable and was paying their returns with other investors' money.

12              **4.    Failure to Keep Accurate Records**

13      88.   The LIAs provided that BNZ "shall maintain accurate and professionally
14  managed records of all funds and accounts for their loan receipts, interest payments,
15  purchases, sales, marketing expenses and other income and expenses."

16      89.   This statement was false.  Until March 2020, BNZ had no professionally
17  managed records of its funds and accounts and instead relied on a spreadsheet of
18  information about investments with BNZ.

19      90.   Even after working with the bookkeeper, and for the entire period from
20  June through August 2021, BNZ failed to maintain an accurate accounting of its
21  liabilities because BNZ's accounting records failed to record so-called bonuses to
22  investors, such as amounts added to investor principal to cover surrender charges
23  investors incurred when liquidating other investments to invest with BNZ.

24      91.   By no later than March 2020, BNZ, Barber, and Zimmerle knew, or
25  were reckless in not knowing, that BNZ was did not maintain accurate records of all
26  funds and accounts for their loan receipts, interest payments, purchases, sales,
27  marketing expenses and other income and expenses.

28

92.    It would have been important to a reasonable investor to know that BNZ did not keep accurate records.

### 5.    Failure to Disclose Barber's FINRA Bar

93.    The LIAs represented that the investor had investigated BNZ, its operations, and its management, and had prior relationships with Barber and Zimmerle.

94.    While some investors had previously invested with either Barber or Zimmerle, many other investors had no prior relationship with BNZ, Barber, or Zimmerle.

95.    Barber told investors that he had a background and degree in finance, was experienced in investing people's money, or worked for a company that manages investors' money.

96.    Defendants did not disclose to investors that Barber had been barred by FINRA from associating with any member firm.

97.    Barber knew, or was reckless in not knowing, of his own FINRA bar.

98.    It would have been important to a reasonable investor to know that Barber had been barred from associating with a broker dealer by FINRA, in light of his representations about his experience in the industry.

99.    Because Barber and Zimmerle are founders and co-managers of BNZ, their scienter, conduct, and statements are imputed to BNZ.

100.    In addition to the Defendants' scienter set forth above, Defendants were also negligent in that they failed exercise reasonable care (1) in misleading investors to believe that BNZ was profiting from its investments and paying returns form those profits; (2) in falsely representing in the LIA's that BNZ maintained accurate accounts; and (3) failing to disclose Barber's FINRA bar when the LIA's indicated that investors had investigated BNZ's management.

# FIRST CLAIM FOR RELIEF

### Fraud in the Offer or Sale of Securities

### Violations of Section 17(a) of the Securities Act

### (Against All Defendants)

101.    The SEC realleges and incorporates by reference paragraphs 1 through 100 above.

102.    In the offer or sale of securities, Defendants misled and deceived investors and prospective investors by (1) misleading investors about BNZ's profitability and the use of investor funds to pay Barber, Zimmerle, sales affiliates and Ponzi-like investor returns; (2) failing to maintain accurate records as represented in the LIAs; and (3) failing to disclose Barber's FINRA bar.

103.    In addition, Defendants engaged in a scheme to defraud whereby they defrauded investors by making and/or disseminating false and misleading statements, misused investor funds by using them to pay Barber and Zimmerle and to pay Ponzi-like returns to investors, and concealed Barber's FINRA bar.

104.    By engaging in the conduct described above, Defendants, directly or indirectly, in the offer or sale of securities, by use of the means or instruments of transportation or communication in interstate commerce or by use of the mails (a) employed devices, schemes, or artifices to defraud; (b) obtained money or property by means of untrue statements of a material fact or by omitting to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchaser.

105.    Defendants, with scienter, employed devices, schemes, or artifices to defraud; and Defendants, with scienter or negligence, obtained money or property by means of untrue statements of a material fact or by omitting to state a material fact necessary in order to make the statements made, in light of the circumstances under

which they were made, not misleading; and Defendants, with scienter or negligence, engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchaser.

106.   BNZ acted entirely through Barber's and/or Zimmerle's knowledge, recklessness and/or negligence, which may be imputed to BNZ.

107.   By reason of the foregoing, Defendants violated, and unless restrained and enjoined will continue to violate, Sections 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

## SECOND CLAIM FOR RELIEF

### Fraud in Connection with the Purchase or Sale of Securities
### Violations of Section 10(b) of the Exchange Act and Rule 10b-5
### (Against All Defendants)

108.   The SEC realleges and incorporates by reference paragraphs 1 through 100 above.

109.   In connection with the purchase or sale of securities, Defendants misled and deceived investors and prospective investors about (1) BNZ's profitability and the use of BNZ investor funds, (2) BNZ's accounting records; and (3) Barber's FINRA bar.

110.   In addition, Defendants engaged in a scheme to defraud whereby they defrauded investors by making and/or disseminating false and misleading statements, misused investor funds by using them to pay Barber and Zimmerle and to pay Ponzi-like returns to investors, and concealed Barber's FINRA bar.

111.   Because Barber and Zimmerle, as co-managers of BNZ, directly and indirectly controlled the entity and exercised day-to-day control over the entity, they are, each of them, the maker of these statements to investors, along with the entity.

112.   By engaging in the conduct described above, Defendants, directly or indirectly, in connection with the purchase or sale of securities, by the use of means or instrumentalities of interstate commerce, or the mails, employed devices, schemes,

or artifices to defraud; made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons, including purchasers and sellers of securities.

113. Defendants, with scienter, employed devices, schemes, or artifices to defraud; made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons, including purchasers and sellers of securities by the conduct described in detail above.

114. BNZ acted entirely through Barber's and/or Zimmerle's knowledge and/or recklessness, which may be imputed to BNZ.

115. By reason of the foregoing, Defendants violated, and unless restrained and enjoined will continue to violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

## THIRD CLAIM FOR RELIEF

### Unregistered Offer and Sale of Securities

### Violations of Sections 5(a) and 5(c) of the Securities Act

### (Against All Defendants)

116. The SEC realleges and incorporates by reference paragraphs 1 through 100 above.

117. The BNZ offering involved the offering of securities in the form of promissory notes and investment contracts.

118. The BNZ offering was not registered with the SEC.

119. Defendant BNZ, as the issuer of the securities, directly offered and sold securities in the form of promissory notes and investment contracts through the LIAs.

120.   Defendants Barber and Zimmerle, directly and indirectly offered and sold the BNZ LIAs, and were necessary participants and substantial factors in BNZ's offering and the sale of the LIAs because, among other things, they controlled BNZ, were its only managers, made presentations to and communicated directly with investors about the LIAs and the merits of investing with BNZ, controlled the website that offered the LIAs, signed LIAs on behalf of BNZ, and received proceeds from the offering.

121.   Purchasers of the LIAs were located in multiple states and Defendants conducted the offering through the Internet and by mail.

122.   By virtue of the foregoing, (a) without a registration statement in effect as to that security, Defendants, directly and indirectly, made use of the means and instruments of transportation or communications in interstate commerce and of the mails to sell securities through the use of means of a prospectus, and (b) made use of the means and instruments of transportation or communication in interstate commerce and of the mails to offer to sell through the use of a prospectus, securities as to which no registration statement had been filed.

123.   By reason of the foregoing, Defendants directly or indirectly violated, and unless restrained and enjoined, will continue to violate, Section 5 of the Securities Act [15 U.S.C. § 77e].

### FOURTH CLAIM FOR RELIEF

**Unregistered Broker-Dealer**

**Violation of Section 15(a) of the Exchange Act**

**(Against Defendants Barber and Zimmerle)**

124.   The SEC re-alleges and incorporates by reference paragraphs 1 through 100 above.

125.   As alleged above, Barber and Zimmerle, acted as unregistered broker-dealers because they each actively solicited investors, made recommendations and other representations, both orally and in writing, about the merits of investing in

BNZ, and received transaction-based compensation, in the form of finders fees, from BNZ.

126.   By engaging in the conduct described above, Barber and Zimmerle made use of the mails and means or instrumentalities of interstate commerce to effect transactions in, and induced and attempted to induce the purchase or sale of, securities without being registered with the SEC in accordance with Section 15(b) of the Exchange Act [15 U.S.C. § 78o(b)].

127.   By engaging in the conduct described above, Barber and Zimmerle violated, and unless restrained and enjoined, are reasonably likely to continue to violate, Section 15(a) of the Exchange Act [15 U.S.C. § 78o(a)].

## FIFTH CLAIM FOR RELIEF

### Control Person Liability

### Section 20(a) of the Exchange Act

### (Against Defendants Barber and Zimmerle)

128.   The SEC re-alleges and incorporates by reference paragraphs 1 through 100 above.

129.   Pursuant to Section 20(a) of the Exchange Act [15 U.S.C. § 78t(a)], any person who, directly or indirectly controls an entity that is liable under any provision of the Exchange Act or any rule or regulation thereunder, shall also be jointly and severally liable with and to the same extent as that entity, unless the controlling person can establish that he acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

130.   As alleged above, BNZ violated Section 10(b) of the Exchange Act and Rule 10b-5 thereunder.

131.   Barber and Zimmerle, as co-managers of BNZ, directly and indirectly controlled the entity and exercised day-to-day control over the entity, including by controlling BNZ's website, from which investors were solicited, making presentations to investors, and by receiving the proceeds of the investor funds.  By

17

reason of the foregoing, Barber and Zimmerle are each liable a control person for BNZ's violations of the Exchange Act and the rules and regulations thereunder.

## **PRAYER FOR RELIEF**

WHEREFORE, the SEC respectfully requests that the Court:

### **I.**

Issue findings of fact and conclusions of law that Defendants committed the alleged violations.

### **II.**

Issue judgments, in forms consistent with Rule 65(d) of the Federal Rules of Civil Procedure, permanently enjoining Defendants, and their officers, agents, servants, employees and attorneys, and those persons in active concert or participation with any of them, who receive actual notice of the judgment by personal service or otherwise, and each of them, from violating Section 10(b) of the Exchange Act [15 U.S.C. §§ 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5] and Section 17(a) of the Securities Act [15 U.S.C. § 77q(a).]

### **III.**

Issue judgments, in forms consistent with Rule 65(d) of the Federal Rules of Civil Procedure, permanently enjoining Defendants and their officers, agents, servants, employees and attorneys, and those persons in active concert or participation with any of them, who receive actual notice of the judgment by personal service or otherwise, and each of them, from violating Sections 5(a) and 5(c) of the Securities Act [15 U.S.C. §§ 77e(a), 77e(c)].

### **IV.**

Issue judgments, in forms consistent with Rule 65(d) of the Federal Rules of Civil Procedure, permanently enjoining Barber and Zimmerle and their officers, agents, servants, employees and attorneys, and those persons in active concert or participation with any of them, who receive actual notice of the judgment by personal

service or otherwise, and each of them, from violating Section 15(a) of the Exchange
Act [15 U.S.C. § 78o(a)].

## V.

Issue an order permanently enjoining Barber and Zimmerle from directly or
indirectly, including, but not limited to, through any entity owned or controlled by
either or both of them, participating in the issuance, purchase, offer, or sale of any
security in an unregistered offering by an issuer; provided, however, that such
injunction shall not prevent Barber or Zimmerle from purchasing or selling securities
for his own personal account.

## VI.

Order Defendants to disgorge all funds received from their illegal conduct,
together with prejudgment interest thereon, pursuant to Exchange Act Sections
21(d)(5) and 21(d)(7) [15 U.S.C. §§ 78u(d)(5) and 78u(d)(7)].

## VII.

Order GIS to disgorge all funds improperly transferred from Defendant's fraud.

## VIII.

Order Defendants to pay civil penalties under Section 21(d)(3) of the Exchange
Act [15 U.S.C. § 78u(d)(3)] and Section 20(d) of the Securities Act [15 U.S.C.
§ 77t(d)].

## IX.

Retain jurisdiction of this action in accordance with the principles of equity and
the Federal Rules of Civil Procedure in order to implement and carry out the terms of
all orders and decrees that may be entered, or to entertain any suitable application or
motion for additional relief within the jurisdiction of this Court.

## X.

Grant such other and further relief as this Court may determine to be just and
necessary.

| | |
|---|---|
| Dated:  October 28, 2021 | */s/ Charles E. Canter* |
| | Charles E. Canter |
| | Kelly C. Bowers |
| | L. James Lyman |
| | Attorneys for Plaintiff |
| | Securities and Exchange Commission |

20